UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ROBERT ANTHONY HAAS | No. 19 CR 486<br><br>Judge Edmond E. Chang |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR COMPASSIONATE RELEASE**

The UNITED STATES OF AMERICA, by JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, submits this memorandum in opposition of Defendant's Motion for Compassionate Release, Dkt. No. 119.

**I.     BACKGROUND**

Defendant has been charged with five counts of threatening to assault or murder a federal law enforcement officer in violation of Title 18, United States Code, Section 115(a)(1)(B). Dkt. No. 38.

In June 2017, after Magistrate Judge Kim ordered that defendant be released from pretrial detention, the government appealed that decision, and Judge Tharp ordered that defendant be detained. Dkt. Nos. 21, 22. Thereafter, defendant filed three motions for pretrial release before this Court. This Court denied defendant's first motion for pretrial release on January 13, 2020, finding that defendant should continue to be detained on the ground that he is a danger to the community. Dkt. No. 72. On March 19, 2020, defendant filed a second motion for pretrial release, arguing that a draft plea agreement circulated by the government, which defendant has rejected, should require defendant's release from detention without conditions

(the "March 2020 release motion"). Dkt. No. 100. Defendant's March 2020 release motion is briefed and is pending before the Court. The government's response to that motion describes in further detail the factual background of this case, and the government incorporates those arguments by reference. Dkt. No. 104; *see also* Dkt. No. 111 (government's May 4, 2020 supplemental response in opposition to pretrial release).

On April 23, 2020, defendant filed a supplemental motion for pretrial release, citing the COVID-19 pandemic. Dkt. No. 119. Defendant does not argue that he has pre-existing health conditions that warrant his release; nor does defendant argue that he has any symptoms of the virus. Because defendant's supplemental motion has not identified an adequate ground for release, he should remain detained.

## II. ARGUMENT

Section 3142(i) allows the judicial officer, in his or her discretion, to temporarily release a defendant previously ordered detained pending trial "in the custody of a United States marshal or another appropriate person . . . to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). As this Court previously found, defendant is a danger to the community. Dkt. No. 72.

The COVID-19 pandemic does not alter the conclusion that defendant should be detained. The MCC has implemented a comprehensive set of protocols to control the spread of COVID-19 within the facility. In light of the need to protect the public, the extensive measures being taken to contain and treat COVID-19 at the MCC, and

the medical resources to which defendant has access at MCC, the Court should deny defendant's motion for pretrial release.

        **A.    The Section 3142(g) Factors Weigh Heavily in Favor of Detention**

Defendant's supplemental motion does not address the statutory factors the Court must consider in determining whether defendant poses a danger to the community. *See, e.g.*, *United States v. Thorne*, No. 18-389 (BAH), 2020 WL 1984262, at *2 (D.D.C. Apr. 27, 2020) ("In assessing [the] statutory elements for exercise of the discretion [to grant temporary release] inherent in Section 3142(i), the Court must be mindful of the factors set out in 18 U.S.C. § 3142(g)."). These factors include: "(1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person . . . ; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). In this case, an examination of the § 3142(g) factors demonstrates that the detention order should remain in place.

        **1.    History and Characteristics of the Defendant**

Defendant has a history with the criminal justice system that includes the following misdemeanor convictions: (1) domestic battery (May 2005); (2) domestic battery (November 2005); (3) obstructing a peace officer (March 2006); and (4) telephone harassment and two additional counts of domestic battery (September 2007). In addition, on or about January 25, 2018, the Indiana Randolph County State's Attorney's Office charged defendant by information with two felony counts of

intimidation under Indiana state law. On information and belief, the Randolph County charges are still pending.

After the Randolph County Court granted defendant bail, defendant broke that court's trust by committing the instant offenses while on bond. As described in the superseding indictment, defendant repeatedly threatened an FBI Task Force Officer (referred to in the superseding indictment as Federal Official C), after Federal Official C had interviewed defendant concerning an investigation. Defendant sent Federal Official C threatening text messages and left Federal Official C a voice mail message that Federal Official C needed a bullet in his head. Dkt. No. 38, Counts I-IV. Defendant made those charged threats after previously threatening other federal officials, and after law enforcement had asked that defendant moderate the tone of his communications. *See* Dkt. No. 1, ¶¶ 1-8. Then, on the date of defendant's June 11, 2019 arrest for threatening Federal Official C, defendant escalated his behavior during his transport from Ottawa to Chicago in an Illinois State Police ("ISP") vehicle, which was equipped with an audio and video recording device. While inside the ISP vehicle, defendant stated, among other things, that Federal Official C "needs a fucking 12-gauge to his fucking throat and pull the trigger and pop his head off his fucking shoulders. And it's gonna happen." Dkt. No. 38, Count V.

### 2. Nature and Circumstances of the Offenses Charged, the Danger to the Community, and Weight of the Evidence

The charged offenses are serious crimes, and defendant committed them after law enforcement had asked that defendant moderate his speech. Defendant's persistence in making threats and explicit threats of harm to others illustrates, as

4

this Court previously found, that defendant is a danger to the community. Furthermore, defendant has made threats against other individuals involved in the judicial process. *See* Dkt. Nos. 104, 111. Defendant has posted messages online about harming judges, prosecutors, law enforcement, and their families, including:

> If I am prosecuted for telling the truth I'm killing EVERYONE involved. Down to the bitch Jews crying pressing charges. Jews will pay for their crimes against humanity in my lifetime. Bet your ass bitches – I'm coming to get ya!
>
> ANYONE trying to take your freedom of speech; kill them, the judge, prosecutor, complaining witnesses and their families!!
>
> Any judge or prosecutor trying to intimidate me best pray I never escape their illegal confinement because their family will be a fucking greases spot.

Dkt. No. 104, pp. 6-7; Dkt. No. 111, p. 2.

In addition, the weight of the evidence against defendant for the charged offenses is strong. In a post-arrest, post-*Miranda* statement, defendant admitted that he had contacted Federal Official C. The government also produced in discovery copies of the charged text messages, voice mail message, and an audio/video recording of the ISP transport, which corroborate defendant's guilt.[1]

### 3. No Combination of Conditions Can Reasonably Assure Defendant's Appearance in Court or Safety to the Community

Defendant has proposed home incarceration with no identified conditions that would ensure the safety of the community. Defendant's decision to threaten Federal Official C while released on bond in his Indiana intimidation case, along with his

---

[1] As this Court observed, it will be up to the jury to determine whether defendant's statements are "true threats" as defined by law. Dkt. No. 114, p. 3.

online postings threatening to harm other people, underscore that defendant is dangerous and should be detained. In his legal brief, defendant argues that his comments are "basic 1st Amendment protected statements." Dkt. No. 118, ¶ 2. This Court may consider whether defendant's behavior makes him a danger to the community, including defendant's statement that families will become "grease[s] spots" if he is released from incarceration. In addition, if the jury finds that defendant's charged statements were true threats, the First Amendment affords him no protection from prosecution.

### B. Officials Have Established Comprehensive Health Measures at the MCC to Prevent Transmission of COVID-19

Defendant was detained at the MCC after Judge Tharp and this Court found that defendant's potential of danger to the community required that he be detained. The COVID-19 pandemic should not change that determination.

Although prisons can become hotspots for infectious disease, the MCC has established a comprehensive set of precautionary measures to limit transmission inside the jail. Based on the most recent information from MCC administrators, as of May 14, 2020, a total of 30 staff members and 137 inmates have tested positive for COVID-19. Of the 30 staff members, 18 have returned to work after receiving medical clearance to do so. The remaining staff members either have not been at the MCC for the last several weeks or have had limited recent interaction with inmates as a result of the restrictions and modifications now in effect at the MCC—that is, inmates are mostly confined to their cells and will continued to be so for the near future.

6

With respect to inmates, one MCC inmate is currently hospitalized, and that inmate will not return to the MCC until the inmate receives medical clearance from a physician to do so. Of the 137 inmates, 120 have been medically cleared and were returned to general population, consistent with BOP's COVID-19 Action Plan.

Despite the positive cases, the MCC remains a comparatively safe place for defendant to be housed. Consistent with the Federal Bureau of Prisons COVID-19 Action Plan, the MCC has taken extraordinary steps to combat the virus and is committed to providing all necessary precautionary measures and supportive therapies to avoid an outbreak of COVID-19, including taking all of the preventative actions advised by the CDC and the Illinois Department of Public Health to protect against the disease.

MCC officials have substantial experience ensuring that viral outbreaks do not occur at their facilities. They recognize the unique threat posed by the transmission of viruses inside a jail. Health and prison officials recognize that COVID-19 carries an increased risk of transmission, carries a higher fatality rate than many other viruses, and has resulted in a state of emergency nationwide. Accordingly, consistent with Phase Two of the Bureau of Prisons COVID-19 Action Plan implemented on March 13, 2020,[2] the MCC has employed the following measures:

- **Social Visitation**. The MCC has placed a temporary hold on all social visits, such as visits from friends and family, as well as all outside programming, to limit the number of people entering the MCC and

---

[2] *See* Federal Bureau of Prisons COVID-19 Action Plan, https://www.bop.gov/resources/news/ 20200313_covid-19.jsp (last visited May 11, 2020).

7

interacting with detainees. Attorney visits are occurring on a case-by-case basis when approved by the warden.

- **Detainees Entering the Facility**. On March 13, 2020, the MCC and BOP suspended inmate movement between facilities for 30 days. (This policy has since been extended beyond the initial 30-day period.) The MCC will make exceptions for special cases such as writs for prosecution on pending charges, Interstate Agreements on Detainers, medical or mental health reasons, RRC placements, and judicial proceedings (which are evaluated on a case-by-case basis). The MCC will also continue to process and admit new inmates, who are being screened for COVID-19 exposure risk factors and symptoms, including having their temperature taken.

- **Screening Procedures**. When a new detainee enters the MCC, medical professionals will screen the inmate for coronavirus symptoms and exposure risk factors, including having the inmate's temperature taken.

- **Sanitation and Hygiene**. Signs and hand sanitizer have been posted throughout the MCC, educating detainees and correctional officers about proper hygiene. In addition, the MCC is increasing daily cleaning of surfaces.

- **Quarantine**. Asymptomatic inmates with exposure risk factors are being quarantined. Symptomatic inmates with exposure risk factors are being isolated and tested for COVID-19 per local health authority protocols.

- **Correctional Officers**. Enhanced health screening of MCC staff will be implemented in areas with "sustained community transmission," as determined by the CDC. Such screening includes self-reporting and temperature checks for the 30 days following March 13 (which has since been extended).

Since late March 2020, the BOP has announced the immediate implementation of additional phases of its COVID-19 Action Plan. Pursuant to Phase 4, on March 26, 2020, the BOP updated its quarantine and isolation procedures to require that all newly admitted inmates to BOP, whether in a sustained community transition area or not, be assessed using a screening tool and temperature check and that

asymptomatic inmates be placed in quarantine for a minimum of 14 days or until cleared by medical staff.[3] Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation.

On April 1, 2020, the BOP announced the immediate implementation of Phase 5 of its COVID-19 Action Plan, which includes the following measures:[4]

- For a 14-day period, inmates in every institution will be secured in their assigned cell or quarters to decrease the spread of the virus. This modification is based on health concerns, not disruptive inmate behavior.

- During this time, to the extent practicable, inmates should still have access to programs and services that are offered under normal operating procedures, such as mental health treatment and education.

- In addition, the BOP is coordinating with the United States Marshals Service to significantly decrease incoming movement during this time.

- After 14 days, this decision will be reevaluated and a decision made whether to return to modified operations.

- Limited group gathering will be afforded to the extent practical to facilitate commissary, laundry, showers, telephone, and Trust Fund Limited Inmate Computer System access.

- As of April 10, 2020, all staff members and inmates at the MCC are wearing face masks for further protection.

As of April 13, 2020, the BOP implemented Phase 6 of its Action Plan. Phase 6 extends until May 18, 2020, the previously adopted limitations on inmate movement, the suspension of social and legal visits, and the requirement of a 14-day quarantine

---

[3] *See* COVID-19 Action Plan: Phase Five, https://www.bop.gov/resources/news/20200331_ covid19_action_plan_5.jsp (last visited May 11, 2020).
[4] *See id.*

9

for all new intakes, detainees, writ returns, parole violators, and hospital returns (even if asymptomatic), in addition to any close contacts of a confirmed or suspected case of COVID-19.[5] Phase 6 also provides that any inmate with COVID-19 symptoms or a fever shall be isolated in a single cell with specific test-based and symptom-based strategies for release from isolation; that all staff and contractors must wear personal protective equipment; and that all staff and inmates should wear face coverings. As a result of those provisions, not only are inmates who have displayed COVID-19 symptoms or tested positive placed in isolation, but also the units in which those inmates were housed pre-isolation are quarantined.

In short, by following the BOP's COVID-19 Action Plan, the MCC has implemented comprehensive measures to protect its detainees and staff from COVID-19. Defendant presumes that his risk of contracting COVID-19 is greater in custody than in the community; but given these measures, a compelling reason does not exist for the defendant's pretrial release in light of the clear and convincing evidence reflected above that no condition or set of conditions can reasonably assure the safety of the community if he is released. *See United States v. Shavers*, No. 1:19-cr-783 VMK (N.D. Ill. May 4, 2020) (denying motion for release based on COVID-19 risk where defendant was a flight risk and a danger to the community, and MCC staff quickly

---

[5] *See* Bureau of Prisons COVID-19 Action Plan: Phase Six, https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf (last visited May 11, 2020); Coronavirus (COVID-19) Phase Six Action Plan, https://prisonology.com/wp-content/uploads/2020/04/COVID-19-Phase-6-Plan-2020-04-13.pdf (last visited May 11, 2020).

10

attended to his health concerns); *United States v. Morale*, No. 5:19-CR-741, 2020 WL 1984900, at *2 (N.D. Ohio Apr. 27, 2020) (denying motion for release based on COVID-19 risk where "U.S. Marshals Service has taken substantial precautions to mitigate the spread of the COVID-19 virus within the prison community"); *United States v. Wesson*, 2020 WL 1814153, at *2 (N.D. Ohio Apr. 9, 2020) (denying post-conviction release under 18 U.S.C. § 3145(c) because the "U.S. Marshals Service has taken extraordinary measures to limit the threat posed by COVID-19," meaning that "speculation about future conditions does not constitute a 'compelling reason' for temporary release."); *United States v. Ayala-Calderon*, 2020 WL 1812587, at *3 (E.D. Tex. Apr. 8, 2020) (denying release because "[d]efendant has not presented any countervailing argument or evidence that adequate precautions are not being taken in the Bowie County Correctional Center"); *United States v. Neadeau*, 2020 WL 1694853, at *3 (D. Minn. Apr. 7, 2020) ("[T]he Court cannot conclude that release is appropriate when the Sherburne County Jail has taken appropriate measures to prevent an outbreak.").

In short, defendant is in a detention facility where social contact with the outside world has been suspended, where new entrants (staff and inmates) are screened, and where measures to isolate high-risk individuals are in place.

### C. Releasing Defendants Like Haas Would Place an Undue Burden on the Pretrial Services Office and the Court.

For the reasons discussed above, there are no release conditions that would protect the public from defendant. In addition, awarding such relief would place a substantial and unwarranted burden on Pretrial Services.

11

To begin with, a Pretrial Services officer must evaluate the proposed residence and meet any other people who live in the residence.[6] In addition, whenever the court orders electronic monitoring as a condition of home confinement, a location monitoring specialist is appointed to oversee the release. One case alone would not overwhelm the system, but if the court were to release this defendant, many more defendants would seek their own release, endangering the community and stretching the capacity of Pretrial Services. A large number of release orders would force officers to conduct a substantial amount of *in-person*, *in-home* meetings, exposing them to a heightened risk of infection—just what defendant purportedly seeks to avoid for himself. *See, e.g.*, *United States v. Hamlin*, 2020 WL 1703848, at *7 (E.D. Wis. Apr. 8, 2020) ("[I]n a situation in which the defendant presents both a risk of non-appearance and a danger to the community, and where that defendant is not at significantly higher risk for severe illness if infected, and where the defendant's release plan is short on details, the court must include in the balance of factors whether the risk to the probation officer is warranted").

The instances of COVID-19 infection at the MCC do not diminish either the Court's interest in assuring the public's interest in keeping him off the streets, nor do they justify exposing court personnel to greater risk of infection.

---

[6] Defendant's MCC communications indicate that another person may have rented defendant's apartment in his absence. It is unclear from defendant's motions whether that person would remain in the apartment if defendant is released.

12

## CONCLUSION

The pertinent factors establish that no condition or combinations of conditions will reasonably assure the safety of the community or the appearance of the defendant as required under 18 U.S.C. § 3142(e). Accordingly, defendant should be detained prior to trial.

                              Respectfully submitted,

                              JOHN R. LAUSCH, JR.
                              United States Attorney

By:    /s/ *Erin Kelly*
          ERIN KELLY
          BARRY JONAS
          Assistant United States Attorneys
          219 S. Dearborn Street, Rm. 500
          Chicago, Illinois 60604
          (312) 353-5300

Dated: May 15, 2020